# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: August 18, 2026

* * * * * * * * * * * * * * * *

JEFFREY YOUNG *and* TARA YOUNG *as parents of L.Y., a minor,*

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

* * * * * * * * * * * * * * * *

No. 19-475V

Special Master Young

*William E. Cochran, Jr.*, Black McLaren, et al., PC, Memphis, TN, for Petitioners.
*Michael Bliley*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

On April 1, 2019, Jeffrey and Tara Young ("Petitioners") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018), on behalf of their minor child, L.Y. Pet., ECF No. 1. Petitioners alleged that L.Y. suffered a Table injury of chronic arthritis as the result of a measles, mumps, and rubella ("MMR") vaccine administered on April 13, 2016. Am. Pet. at 1, ECF No. 12. In the alternative, Petitioners alleged L.Y.'s chronic arthritis was caused-in-fact by the April 13, 2016 MMR vaccination. *Id.* Petitioners' pre-hearing brief abandoned the Table claim and narrowed the injury to juvenile idiopathic arthritis ("JIA").[2] Pet'r's Br. at 1, ECF No. 58. During the hearing, Petitioners confirmed they were not making a Table claim, and that the correct diagnosis is JIA.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Ruling will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioners have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] JIA is "rheumatoid arthritis in children, with swelling, tenderness, and pain in one or more joints, which may lead to impaired growth and development, limitation of movement, ankylosis, and flexion contractures." *Juvenile Chronic Arthritis*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=58971 (hereinafter "DORLAND'S").

Tr. 5–6. Respondent agreed with the JIA diagnosed but disputed causation. Tr. 5; Resp't's Br. at 14, ECF No. 59.

After carefully analyzing and weighing the evidence presented in this case in accordance with the applicable legal standards, I find that Petitioners have provided preponderant evidence that the MMR vaccine L.Y. received on April 13, 2016, caused her to suffer from JIA. Accordingly, Petitioners are entitled to compensation.

## I. Procedural History

Petitioners filed their petition on April 1, 2019, and filed medical records on May 20, 2019. Pet.; Pet'r's Exs. 1–9, ECF No. 8; Pet'r's Exs. 10–15, ECF No. 9. Petitioner filed an amended petition and additional medical records on September 13, 2019. Am. Pet.; Pet's's Exs. 16–20, ECF No. 13. Petitioners filed photograph exhibits on September 17, 2019, and affidavits and a medical chronology created by Tara Young on September 24, 2019. Pet'r's Exs. 21–25, ECF No. 16; Pet'r's Exs. 26–28, ECF No. 17. On October 7, 2019, Petitioner filed affidavits and excerpts from Tara Young's calendar. Pet'r's Exs. 29–30, ECF No. 18. Petitioners filed insurance documents on February 26, 2020. Pet'r's Exs. 31–32, ECF No. 25. On March 30, 2020, Respondent filed his Rule 4(c) report arguing against compensation. Resp't's Rep., ECF No. 26.

On July 14, 2020, Petitioners filed an expert report from M. Eric. Gershwin, M.D., and medical literature. Pet'r's Exs. 33–46, ECF No. 31. Respondent filed an expert report from Carlos D. Rose, M.D., and medical literature on October 22, 2020. Resp't's Exs. A, Tabs 1–8, ECF No. 33. Petitioners filed a supplemental report from Dr. Gershwin and medical literature on January 8, 2021. Pet'r's Exs. 47–51, ECF No. 34. On April 26, 2021, Respondent filed a supplemental report from Dr. Rose. Resp't's Ex. C, ECF No. 38. On June 10, 2021, Petitioners filed a second supplemental report from Dr. Gershwin and medical literature. Pet'r's Exs. 64–68, ECF No. 39. Petitioners filed updated medical records on April 19 and 21, May 24, 2021, and October 18, 2023. Pet'r's Exs. 69, ECF No. 41; Pet'r's Ex. 70, ECF No. 42; Pet'r's Ex. 71, ECF No. 43; Pet'r's Exs. 72–75, ECF No. 46. On December 6, 2023, I issued a decision awarding Petitioners interim attorneys' fees and costs following Petitioners' motion and Respondent's response. *See* ECF Nos. 44–45, 47.

On March 21, 2024, I scheduled this case for an entitlement hearing set for June 10–11, 2025. ECF No. 53. Petitioners filed additional updated medical records on November 26, 2024. Pet'r's Exs. 76–79, ECF No. 56. Petitioners filed their pre-hearing brief on February 6, 2025. Pet'r's Br. Respondent filed his pre-hearing brief on April 11, 2025, and Petitioner filed a reply brief on May 9, 2025. Resp't's Br.; Pet'r's Reply, ECF No. 63. An entitlement hearing was held on June 10, 2025. Min. Entry, docketed June 10, 2025; Tr. No post-hearing briefs were filed. This matter is now ripe for adjudication.

## II. Factual History

### A. Pre-Vaccination Medical Records

On December 9, 2015, at almost one year old, L.Y. presented to Warren Pediatric Associates ("Warren Pediatrics") with a fever and congestion. Pet'r's Ex. 11 at 39. She was

diagnosed with an ear infection and prescribed antibiotics (cefdinir). *Id.* One week after starting antibiotics, on December 15, 2015, L.Y.'s mother called Warren Pediatrics indicating L.Y. had diarrhea and fever. *Id.* at 37. They returned to the pediatrician's office later that day for a re-check. *Id.* The assessment was acute viral upper respiratory infection ("URI"), and Petitioners were advised to discontinue L.Y.'s antibiotics. *Id.* at 38.

On January 8, 2016, L.Y. presented for her one-year well-child visit. Pet'r's Ex. 6 at 34. There were no presenting concerns. *Id.* at 34–35. At this visit, L.Y. received the pneumococcal conjugate ("Prevnar 13") vaccine and her second dose of the hepatitis A vaccine. *Id.* at 36. L.Y.'s mother indicated that she was "refusing to give more than [one] 'old' vaccine with 'new vaccines.'" *Id.* at 34. She agreed for L.Y. to get the MMR and varicella vaccines at the next visit. *Id.*

On February 19, 2016, L.Y. returned to Warren Pediatrics for cough and congestion. Pet'r's Ex. 6 at 32–33. Her mother reported that L.Y. had a fever the night before. *Id.* at 33. L.Y. was diagnosed with a common cold and given symptomatic treatment. *Id.* On March 30, 2016, L.Y. returned to the pediatrician with a rash that appeared the day before. *Id.* at 31. The rash had started on her abdomen and spread to her neck and behind her ears. *Id.* L.Y.'s mother reported that L.Y. had a gastrointestinal ("GI") infection the week before with vomiting and diarrhea but had since resolved. *Id.* She also reported nasal congestion with clear rhinorrhea and a 102 degree fever three days prior. *Id.* L.Y.'s brother also had a URI at the time. *Id.* L.Y. had been "clingy and fussy with decrease[d] appetite" the past three days. *Id.* On physical examination, her skin showed a "[d]iffuse erythematous blanching macular rash over the trunk, neck, and face." *Id.* at 32. She was diagnosed with roseola[3] and was told it would resolve in two to three days. *Id.*

### B. Vaccination and Post-Vaccination Medical Records

L.Y. presented for her 15-month well-child visit on April 13, 2016. Pet'r's Ex. 6 at 27. There were no presenting concerns. *Id.* at 28. L.Y.'s mother reiterated her "concerns about number of vaccines given at the same time." *Id.* at 28. There was a "lengthy discussion about the role of vaccines in children's health," and L.Y.'s mother agreed that L.Y. could receive both the MMR and varicella vaccines. *Id.* at 28–30. L.Y. received both the MMR and varicella vaccines at this visit. *Id.* at 30–31.

On July 12, 2016, L.Y.'s grandmother brought her to Warren Pediatrics for warm "swollen ankle and knee joints, difficulty walking, and a limp." Pet'r's Ex. 6 at 24. It was reported L.Y. had developed right knee swelling and a limp roughly ten days prior, on July 2, 2016. *Id.* "About one month ago," L.Y. had a similar swelling of her right ankle. *Id.* There was no known recent bug bites, fever, illnesses, falls, or other injuries. *Id.* L.Y.'s treating physicians assessed acute arthritis of the right knee and ankle, possibly due to Lyme disease. *Id.* L.Y.'s physician ordered labs to determine if Lyme disease could be the cause of the swollen joints. *Id.* at 25. The Lyme disease test returned negative, but L.Y. had an elevated ESR of 47. *Id.* at 19, 23. L.Y. was prescribed amoxicillin. *Id.* at 22.

---

[3] Roseola is "a type of rose-colored rash seen most often in an infectious disease such as measles or other exanthematous diseases." *Roseola*, DORLAND'S.

L.Y. returned to the pediatrician on July 20, 2016, for her 18-month well-child visit. Pet'r's Ex. 6 at 19. She presented with febrile illness, as well as continued acute arthritis symptoms in the right knee and ankle. *Id.* Since she was last seen, she had some improvement of her arthritis symptoms, and she was able to walk without a limp. *Id.* The assessment was "[a]cute arthritis, cause uncertain." *Id.* at 21. L.Y. was advised to continue taking the full course of amoxicillin. *Id.*

On July 22, 2016, L.Y. presented to pediatric rheumatologist Elaine Cassidy at Children's Hospital of Pittsburgh for a rheumatology consultation. Pet'r's Ex. 6 at 84. Dr. Cassidy noted L.Y. had joint pain and swelling around June 4, 2016, and right leg limping, which began on July 12, 2016. *Id.* In the week prior to the appointment, L.Y. had intermittent fever temperatures, including the morning of her visit. *Id.* at 85. Physical examination demonstrated warmth, swelling and tenderness of L.Y.'s right elbow, knee, and ankle. *Id.* at 86. Dr. Cassidy's assessment was polyarticular[4] JIA. *Id.* She wrote that L.Y. had "recent temps but likely attributable to viral infections. She had recent infection but, after the onset of [joint] symptoms making a post infectious/reactive arthritis less likely." *Id.* at 87. On July 26, 2016, L.Y. was seen by Nicholas Seala, M.D. at Pediatric Ophthalmology to establish care given her JIA diagnosis. Pet'r's Ex. 5 at 5–7. Dr. Sela determined that L.Y. did not have any ocular involvement at that time. *Id.*

L.Y. returned to Dr. Cassidy on August 5, 2016, for a follow-up. Pet'r's Ex. 6 at 88. L.Y. continued to have joint pain but had improved range of motion. *Id.* at 89. The plan was to start L.Y. on methotrexate and steroids. *Id.* at 91. L.Y. was also prescribed naproxen as needed. *Id.* at 91. On October 7, 2016, L.Y. had improvement but continued to have stiffness, pain, swelling, and limitations with activities. *Id.* at 96. The plan was to start Enbrel in addition to the methotrexate and increase the dose of steroids (prednisone). *Id.* at 96–97. However, on November 11, 2016, Petitioners decided to hold off on starting Enbrel. *Id.* at 102. By January 9, 2017, L.Y. had some clinical improvement with less pain. *Id.* at 107.

On January 18, 2017, L.Y. returned to Warren Pediatrics for a two-year well-child visit. Pet'r's Ex. 6 at 11. It was noted Petitioners were advised to avoid live vaccines while L.Y. was on her current treatment (methotrexate and prednisone). *Id.* L.Y.'s mother wished to discuss whether "exposure to normal vaccines has any relationship to [L.Y.'s] disease." *Id.* L.Y.'s physicians had a lengthy discussion with L.Y.'s mother about the need for appropriate vaccination in children. *Id.* L.Y. exhibited pain in her knees, ankles, right elbow, and left fifth finger. *Id.* She remained active, but ESR dropped from 80 to 7. *Id.* L.Y. received the Pentacel vaccine, while deferring the hepatitis A vaccine, and continued with her course of medication. *Id.* at 13.

On June 5, 2017, L.Y. returned to Dr. Cassidy. Pet'r's Ex. 6 at 72. Dr. Cassidy noted that L.Y. was showing marked improvement after taking Enbrel, with less swelling and no arm stiffness. *Id.* She had been weaned off prednisone and was no longer taking methotrexate. *Id.* at 75. Dr. Cassidy recommended that L.Y. continue taking the Enbrel and restart the methotrexate. *Id.*

L.Y.'s family moved to Florida in July 2017, and established care with pediatric rheumatologist Laisa Santiago of Johns Hopkins All Children's Hospital in Florida. Pet'r's Ex. 8 at 41. Dr. Santiago's assessment was "ANA positive, moderate-to-severe protracted polyarticular

[4] Polyarticular means "affecting many joints." *Polyarticular*, DORLAND'S.

[JIA] with associated flexion joint contractures." *Id.* at 44. She recommended restarting methotrexate and increasing the dosage of Enbrel. *Id.* at 45. Dr. Santiago advised L.Y. should not receive live vaccines while on immunosuppressants but she could receive all others. *Id.*

On August 2, 2017, L.Y. presented to Coastal Eye Institute, where she was diagnosed with ocular uveitis.[5] Pet'r's Ex. 4 at 14. She was prescribed steroidal eye drops. *Id.* On August 28, 2017, L.Y. presented to Howard Fuchs Pediatrics to establish pediatric care. Pet'r's Ex. 3 at 5. L.Y.'s parents were "wondering if [her condition was] allergy related." *Id*. A Quest Diagnostics allergy testing panel, ran on September 7, 2017, revealed no allergy to IgA, gliadin, eggs, cow's milk, wheat, peanut butter, or soybeans. *Id*. at 6–7.

On September 18, 2017, L.Y. returned to Dr. Santiago showing improvements in morning stiffness and joint swelling. Pet'r's Ex. 8 at 33. This improvement came after L.Y. had increased her dose of Enbrel and had begun taking oral methotrexate. *Id.* However, Dr. Santiago noted L.Y. was not having any improvement in arthritis findings. *Id.* at 34. Dr. Santiago recommended discontinuing Enbrel treatment and beginning subcutaneous injections of Humira. *Id.*

Throughout 2018, L.Y. continued to follow up with Dr. Santiago. *See generally* Pet'r's Ex. 8. On January 7, 2018, L.Y. presented with an acute fever. *Id.* at 27. Dr. Santiago noted L.Y. was going to her primary doctor for "further evaluation and treatment of possible infectious etiology to her acute fever as this has not been a feature of her JIA." *Id.* at 28. She was referred to physical therapy and told to restart Humira when her infection cleared. *Id.* On February 15, 2018, L.Y. was seen by J.E. Williams at LifeSpan Testing & Integrative Longevity Medicine. Pet'r's Ex. 9 at 1. He noted:

> I've been in email contact with [L.Y.'s] father who read my book, Viral Immunity. He questions whether food allergies or a viral infection could cause [rheumatoid arthritis ("RA")]. Her symptoms started when they lived in Pennsylvania after MMR vaccine. She also had [r]oseola infection about the same time. . . . There is a family history on the father's side of RA and thyroid disease, possibly Hashimoto's thyroiditis. The father has many allergies. . . . Her father would like IgG allergy testing. Recent IgE food panel was negative. Celiac disease panel showed high IgA with negative gliadin and transgultaimase Ab. I provided a records release form to review other tests. IgG food allergies are a consideration for further workups along with TOP Ab and HHV-6 Abs.

*Id.*

L.Y.'s mother wanted to discontinue methotrexate and decrease dosages of prednisone as she saw no benefit. *See, e.g.*, Pet'r's Ex. 8 at 13. She instead put L.Y. on an elimination diet that she felt would "cure" her. *Id.* L.Y. continued with Humira. *Id.* Dr. Santiago recommended L.Y. start tocilizumab, but L.Y.'s mother consistently declined. *See id.* at 1, 7, 15. Dr. Santiago expressed concerns about the progression of L.Y.'s disease and possible irreversible joint damage. *Id.* at 9.

[5] Uveitis is "an inflammation of part or all of the uvea, commonly involving the other tunics of the eye (sclera, cornea, and retina)." *Uveitis*, DORLAND'S.

In January 2019, Dr. Santiago again noted the severity of L.Y.'s symptoms in light of her parents' refusal to administer tocilizumab, and that they were "encouraged to seek another pediatric rheumatology opinion" on the matter. Pet'r's Ex. 8 at 3. In February 2019, L.Y.'s parents stopped administering Humira to L.Y. due to "lack of noted improvement." Pet'r's Ex. 18 at 193. In March 2019, Dr. Santiago again recommended tocilizumab, and this time L.Y.'s parents agreed, and she was placed on a short course of steroids to mitigate her symptoms while arrangements were made for the tocilizumab infusions. *Id.* at 194. L.Y. began tocilizumab in April 2019 and was tolerating it well with improvement in symptoms. *Id.* at 106, 136, 165. L.Y. also received Kenalog injections under anesthesia to her bilateral wrists, knees and ankles for additional relief of her JIA symptoms. *Id.* at 18–19, 98–99.

L.Y. continued to follow up with rheumatology, taking prednisolone daily and receiving tocilizumab infusions every four weeks through January 2020. Pet'r's Ex. 70 at 73–99. As of February 27, 2020, L.Y. added weekly methotrexate and had already received three doses. *Id.* at 67–71. L.Y. continued all three medications—daily prednisolone, weekly methotrexate, and tocilizumab infusions every four weeks—until August 2020, at which time she had stopped taking prednisone. *Id.* at 43–66. As of July 22, 2024, L.Y. had ongoing signs of active arthritis, but she and her mother reported that she was not functionally limited by her ongoing joint inflammatory process. Pet'r's Ex. 80 at 8–14.

## III. Petitioners' Affidavits and Testimony

### A. Jeffrey Young

Jeffrey Young ("Mr. Young"), is the father of L.Y. Pet'r's Ex. 26 at ¶ 2. Mr. Young averred that prior to the April 13, 2016 MMR vaccination, L.Y. "had never suffered from chronic arthritis. She began to exhibit joint swelling associated with the onset of chronic arthritis in May 2016." *Id.* at ¶ 4. While he did not recall exactly when L.Y.'s joint swelling started in May, he was "certain it started no later than May 21, 2016," because of photographs taken of L.Y. on that date that show swelling in her right ankle. *Id.* (citing Pet'r's Ex. 21). He noted additional photographs showing swelling taken on May 26, 2016, and June 11, 2016. *Id.* (citing Pet'r's Exs. 22–23). L.Y. was diagnosed with JIA on July 22, 2016. *Id.* at ¶ 5.

At the hearing, Mr. Young testified consistent with his affidavit. Tr. 32–43. Prior to her vaccinations, he described L.Y. as a healthy toddler. Tr. 34. He described the photographs reflecting the swelling of L.Y.'s joints. Tr. 35–36. He testified that in July 2017, one year after L.Y.'s diagnosis, the family moved to Florida to see if L.Y. would improve with the warmer climate and to be closer to his in-laws. Tr. 37–38. Mr. Young continued his testimony describing L.Y.'s treatment and current condition. Tr. 38–43.

### B. Tara Young

Tara Young ("Ms. Young"), is L.Y.'s mother. Pet'r's Ex. 27 at ¶ 2. Ms. Young's affidavit is identical to Mr. Young's affidavit with one additional paragraph. *See id.* She added that on August 28, 2017, she "created a chronology of [L.Y.'s] relevant medical history for the purpose of providing that information to her new healthcare providers" since they had just moved to

Florida. *Id.* at ¶ 7 (citing Pet'r's Ex. 25). She averred that in the chronology, she indicated the date she first noticed L.Y.'s ankle swelling was May 20, 2016.[6] *Id.* Ms. Young averred that at the time she created this chronology, she was not aware of the Vaccine Injury Compensation Program. *Id.*

At the hearing, Ms. Young testified consistent with her affidavit. Tr. 11–31. She also described L.Y. as being "normal" prior to her MMR vaccination and described when she first noticed L.Y.'s swollen joints. Tr. 14–15. She testified she found it "very odd" because L.Y. did not have any injuries. Tr. 15. She decided to keep an eye on it and not take her to the doctor right away because L.Y. did not have a fall or any other traumatic event. Tr. 29. Ms. Young also described the photographs in the record. Tr. 14–18. The first photograph showing L.Y.'s ankle swelling is from May 21, 2016. Tr. 16–17. She testified about the chronology she made "to give [her] a better idea of what happened from when [L.Y.] was born to when she was diagnosed -- when she got her vaccines to when she was diagnosed, what happened in between all that." Tr. 21. She testified she created this document in 2017 and was not aware of the Vaccine Injury Compensation Program at the time. Tr. 21–22. On cross examination Ms. Young added that she was used to documenting things in Excel for work so she started this timeline for herself to remember. Tr. 28. "And then in preparation for meeting new providers in Florida, [she] wanted them to have a little bit of a timeline." *Id.* She stated she did not know exactly when she started this document but that it was finished in August 2017. *Id.*

Ms. Young was recalled at the end of the hearing to clarify her recollection of events from first noticing L.Y.'s swollen ankle, to the condition progressing and taking L.Y. to rheumatology. Tr. 182–88. She testified she "conservatively" gave May 20, 2016 as the date she noticed L.Y.'s ankle swelling. Tr. 183–84. She also testified about a rash L.Y. developed in the later part of July 2016 that she described as "a rubella-type of rash" and "gnarly." Tr. 185.

### C. George and Cecilia Kramer

George and Cecila Kramer ("Mr. and Ms. Kramer") each submitted an affidavit; the affidavits are identical. Pet'r's Exs. 29–30. They are L.Y.'s grandparents and Ms. Young's parents. Pet'r's Ex. 29 at ¶ 2; Pet'r's Ex. 30 at ¶ 2. In May 2016, they were living in Florida while L.Y. and her parents were living in Pennsylvania. Pet'r's Ex. 29 at ¶ 3; Pet'r's Ex. 30 at ¶ 3. They had a trip to visit them in Pennsylvania beginning May 25, 2016. *Id.* During the week before their trip, they called Ms. Young, who told them that L.Y. "had swelling in her ankle or ankles and asked what might be causing the swelling." Pet'r's Ex. 29 at ¶ 4; Pet'r's Ex. 30 at ¶ 4. They were not sure but noted they would be there soon to observe the swelling. *Id.* Prior to this phone call, neither Mr. nor Ms. Kramer had "[]ever observed any swelling in any of [L.Y.'s] joints" and had "never heard any complaints about swelling in any of [L.Y.'s] joints." *Id.* When they arrived in Pennsylvania, they observed the swelling in at least one of L.Y.'s ankles which they thought was "unusual." Pet'r's Ex. 29 at ¶ 6; Pet'r's Ex. 30 at ¶ 6. They confirmed that the photograph of L.Y.'s ankle, dated May 26, 2016, is consistent with what they saw. Pet'r's Ex. 29 at ¶ 8; Pet'r's Ex. 30 at ¶ 8 (citing Pet'r's Ex. 22).

[6] Ms. Young's affidavit actually stated May 20, 2019; however, this is a clear typographical error pursuant to the medical records. The chronology shows Ms. Young first noticed L.Y.'s ankle swelling on May 20, 2016. *See* Pet'r's Ex. 25 at 1.

## IV. Expert Reports

### A. Expert Qualifications

#### 1. Petitioner's Expert, M. Eric Gershwin, M.D.

Dr. Gershwin is board certified in internal medicine, rheumatology, and allergy and immunology. Pet'r's Ex. 34 at 2; Tr. 47. He received his M.D. from Stanford University. Pet'r's Ex. 34 at 1. He completed a residency in internal medicine at Tufts University and fellowships in rheumatology and allergy at University of California, Davis. Tr. 46–47. He is currently a Distinguished Professor of Medicine in the Division of Rheumatology/Allergy and Clinical Immunology at University of California, Davis. Pet'r's Ex. 34 at 1; Tr. 46. Dr. Gershwin estimated he has treated hundreds of patients with JIA in 50 years. Tr. 48.

#### 2. Respondent's Expert, Carlos D. Rose, M.D.

Dr. Rose is a board-certified pediatric rheumatologist. Resp't's Ex. A at 1; Tr. 101. He graduated from the University of Buenos Aires School of Medicine in Argentina. Resp't's Ex. B at 1. He completed internships in internal medicine and pediatrics as well as fellowships in adult rheumatology at the National Institute of Rehabilitation in Buenos Aires, Argentina. Resp't's Ex. A at 2. He also completed a pediatric residency at Nemours (Thomas Jefferson University) in Philadelphia, Pennsylvania, and a fellowship in pediatric rheumatology at the Children's Hospital of Philadelphia. *Id.* Dr. Rose retired from practice in 2020 after caring for adults and children with rheumatic and autoimmune diseases for 40 years. *Id.* He has seen and cared for hundreds of children with JIA. *Id.*; Tr. 102. Dr. Rose is currently an Honorary Professor at Thomas Jefferson University. Resp't's Ex. A at 1.

### B. Expert Reports and Testimony

#### 1. Dr. Gershwin

Dr. Gershwin opined that L.Y. has JIA, which is an autoimmune condition. Tr. 54. He summarized his opinion during the hearing as follows:

> I think that my opinion is that JIA is caused by a combination of a genetic predisposition and some environmental stimulation. It requires both. I think the environmental stimulation here was the vaccination that [] occurred. These vaccines are all viruses. They're live viruses. They are weaker. It takes some time for them to divide and grow before you elicit an immune response. I think the elicited immune response produced autoreactive T cells, an antibody that reacted with her joints, but was actually intended to react with a virus, something we call molecular mimicry[.] . . . So essentially what happens is L.Y. gets the vaccination with the viruses. The viruses will divide until they reach a critical threshold of eliciting an immune response. But L.Y.'s immune system is unable to distinguish some antigens or epitopes on the surface of the viral vaccines from antigens in our

> own tissues. And that's what molecular mimicry is. That leads to cross-reactivity. It occurred within a period of six weeks, which is a logical sequence of events for elicitation of an immune response against a vaccine.

Tr. 51.

Dr. Gershwin admitted that JIA "is still poorly understood." Pet'r's Ex. 33 at 2; *see also* Pet'r's Ex. 47 at 2 ("Although some predisposing JIA genes are now being identified, research aimed at identifying environmental influences lags behind most other autoimmune diseases.") (quoting Pet'r's Ex. 46 at 1)).[7] In his initial written report, Dr. Gershwin defined JIA as "a heterogeneous and multi-factorial autoimmune disease characterized by chronic joint inflammation in children with onset ages younger than 16 years." Pet'r's Ex. 33 at 2. During his testimony, he explained the synovium i.e., the lining of the joint, "is a very complicated structure" and "[w]e still don't know very much about the antigens within the synovium." Tr. 58; *see also* 76. He also noted JIA is rare enough to not be detected in epidemiologic studies of vaccine safety. Pet'r's Ex. 33 at 2. However, Dr. Gershwin testified he has personally investigated the pathogenesis of JIA. Tr. 58.

The 2011 Lin et al. article,[8] in which Dr. Gershwin is a named author, explained that JIA is an autoimmune disease and that autoimmunity it a "result of immune reactions triggered by environmental factors in a genetically susceptible individual." Pet'r's Ex. 36 at 2. The article summarized the distinct pathogenesis and immunologic abnormality of polyarticular JIA and systemic JIA. *Id.* at 1. They found "increasing evidence of a distinct pathogenesis of []polyarticular JIA compared to systemic JIA." *Id.* Systemic JIA is "associated with granulocytosis, thrombocytosis, and increase of acute-phase reactants in the peripheral blood, indicating an uncontrolled activation of the innate immune system." *Id.* "Oligo/polyarticular[9] JIA is an antigen-driven lymphocyte-mediated autoimmune disease with abnormality in the adaptive immune system." *Id.* Lin et al. also found that "[i]mbalance between autoreactive Th1/Th17 and Treg cells leads to the failure of T cell tolerance to self-antigens, which contributes to the synovial inflammation of []polyarticular JIA." *Id.* Dr. Gershwin testified that the "fact that there are specific autoreactive T cells found that produce cytokines is further evidence that [JIA] is an antigen-driven process." Tr. 59; *see also* Tr. 70–71 (testifying JIA is an antigen-driven disease (citing Pet'r's Ex. 63)).[10] He further acknowledged the relationship between JIA and ocular uveitis and testified that the uvea is a portion of the middle eye that gets inflamed in polyarticular JIA. Tr. 54. In fact, the same antigen that is present in the synovium is also present in the eye, causing inflammation of both. Tr. 55.

[7] Justine A. Ellis et al., *Possible Environmental Determinants of Juvenile Idiopathic Arthritis*, 49 RHEUMATOLOGY 411 (2010).
[8] Yu-Tsan Lin et al., *The Pathogenesis of Oligoarticular/Polyarticular vs Systemic Juvenile Idiopathic Arthritis*, 10 AUTOIMMUNE REVS. 482 (2011).
[9] Oligo or oligoarticular JIA is the same as polyarticular JIA except a fewer number of joints are involved. Oligo refers to a "small number of joints." *Oligoarthritis*, DORLAND'S.
[10] Antony P.B. Black et al., *T-Cell Activation Without Proliferation in Juvenile Idiopathic Arthritis*, 4 ARTHRITIS RSCH. 177 (2002).

Dr. Gershwin reiterated that JIA is an autoimmune disease and asserted that it therefore requires a genetic factor and an environmental factor. *See* Pet'r's Ex. 33 at 3, 11–12; Pet'r's Ex. 47 at 1; Pet'r's Ex. 64 at 1; Tr. 51, 58, 78. In regard to environmental factors, Lin et al. wrote that infectious agents have been suggested to be a trigger of JIA, but that "their pathogenicity in JIA is still not well proven and most studies are inconclusive." Pet'r's Ex. 36 at 3. The authors commented that vaccines, like infections, may trigger autoimmune diseases through various mechanisms such as molecular mimicry, bystander activation, and lymphocyte activation. *Id.* at 3. "However, there is no evidence that vaccination is associated with the onset or exacerbation of []polyarticular JIA so far." *Id.*

Molecular mimicry, according to Dr. Gershwin, is the most likely initiator of JIA. Tr. 57; Pet'r's Ex. 33 at 7, 12. "This is not to say that as the disease goes on, other immune pathways are involved" in the joint destruction. Tr. 57. Once tolerance is broken, bystander activation and additional cytokine production can be involved, but "the most likely onset [of JIA] is molecular mimicry." *Id.*

Notwithstanding this assertion, Dr. Gershwin admitted that he is unable to identify a relevant epitope for cross-reactivity. Tr. 72–73; Tr. 190 (testifying "we don't know what the antigen is -- the autoantigen in [JIA]"); Pet'r's Ex. 33 at 8 (writing "we do not know what the actual self antigen is in JIA"). When Dr. Gershwin was recalled at the hearing, he testified that he and Dr. Rose agree that JIA is the result of an adaptive immune response and "agree that the T lymphocytes within the synovium reflect adaptive antigen-driven response." Tr. 190. Accordingly, Dr. Gershwin testified "the deficiencies [in his theory] are simply that the science has lagged to identify what the antigen is. . . . It doesn't mean the theory is wrong. . . . The problem is the lack of data in children with [JIA]." *Id.* He opined this "problem of JIA will only be solved in the future with technology like deep sequencing, single cell isolations, clonal diversity. It's not going to be solved by classic epidemiology." Tr. 193; *see also* Pet'r's Ex. 33 at 9 (writing that "predicting of epitopes has not yet reached practical reality"), 12 ("Unfortunately, we do not know the autoantigen in JIA (unlike adult RA) and definition of cross-reactive epitopes beyond primary sequence is beyond medical science at present.").

Dr. Gershwin opined that "[i]nfectious agents are the most important environmental factors in the development of autoimmunity" and JIA. Pet'r's Ex. 33 at 3. "An infectious agent may induce a cross-reactive immune response (molecular mimicry). Inflammation provoked by infection activates antigen-presenting cells, leading to increased immunogenicity of auto-antigens, priming of T cells with broad specificities, polyclonal lymphocyte activation and subsequent autoimmunity." *Id.* (quoting Pet'r's Ex. 39 at 3);[11] Tr. 70–71 (citing Pet'r's Ex. 82 (discussing vaccine reactogenicity)).[12] Dr. Gershwin cited several articles to support molecular mimicry and the development of autoimmune diseases. *See* Tr. 60–65.

[11] Yackov Berkun & Shai Padeh, *Environmental Factors and the Geoepidemiology of Juvenile Idiopathic Arthritis*, 9 AUTOIMMUNITY REVS. A319 (2010).
[12] Caroline Herve et al., *The How's and What's of Vaccine Reactogenicity*, 4 NPJ VACCINES 39 (2019).

For example, Dr. Gershwin relied on Schattner[13] for the proposition that MMR infections and the MMR vaccine can cause arthralgias and chronic arthritis. Tr. 61 (citing Pet'r's Ex. 37 at 3–4); Tr. 193; Pet'r's Ex. 33 at 4. Schattner found that varicella has been suggested "as potentially linked . . . to some cases of chronic arthritis which may in fact be related to virus persistence." Pet'r's Ex. 37 at 3. Likewise, "[j]oint reactions following rubella vaccination have been well recognized since the late 60s," and "[t]he development of transient arthralgia, acute arthritis, and even chronic arthritis are well documented." *Id.* at 3. The article also noted that "[f]ew significant autoimmune adverse effects have been [found in] the literature and the VAERS database." *Id.* at 5. The authors warned about the danger of vaccination noncompliance, partly due to misinformation about autoimmune disease causation. *Id.* at 5–6.

> To establish a role for viral vaccines in the subsequent development of autoimmunity or autoimmune diseases several conditions have to be met. First, virus infections should be linked to autoimmunity. Second, a mechanism or mechanisms whereby exposure to viral antigens (be it during infection or vaccination) leads to autoimmunity must be established. Third, evidence must be obtained that patients who have been vaccinated against viruses developed an autoimmune disease, bearing in mind that association alone does not necessarily indicate causality.

*Id.* at 6.

Berkun & Padeh studied the "possible role of environmental factors in the pathogenesis of JIA." Tr. 67 (citing Pet'r's Ex. 39). Dr. Gershwin testified that Berkun & Padeh "suggested that vaccines are possible inductive agents, in particular through molecular mimicry." *Id.* The authors explained that while JIA is thought to be the result of an immune reaction caused or triggered by environmental factors in genetically susceptible hosts, "no single causative factor [has] been proven so far." Pet'r's Ex. 39 at 1. They explained infectious agents and how they might induce a cross-reactive immune response (molecular mimicry) to trigger JIA. *Id.* at 3. "Inflammation provoked by infection activates the antigen-presenting cells, leads to increased immunogenicity of autoantigens, priming of T-cells with broad specificities, polyclonal lymphocyte activation and subsequent autoimmunity." *Id.* Berkun & Padeh also discussed vaccinations as a disease trigger. *Id.* at 4. "Similar to infectious agents, vaccines may trigger autoimmune diseases through various mechanisms (e.g., molecular mimicry of vaccine with self antigens, antigen non-specific bystander activation, polyclonal lymphocyte activation during immune response to vaccine, amongst others)." *Id.* The authors noted that epidemiologic studies "showed no increase in JIA incidence shortly after vaccinations." *Id.* at 4. They also commented on a large retrospective multicenter study showing the MMR vaccine did not aggravate disease activity in JIA and discussed the limited case reports of JIA exacerbation following vaccination. *Id.* at 4–5.

One case report, Korematsu et al.,[14] described a child with systemic JIA who was in remission, but after a rubella vaccination, had an abrupt relapse. Pet'r's Ex. 33 at 4; Tr. 66 (citing

---

[13] Ami Schattner, *Consequence or Coincidence? The Occurrence, Pathogenesis and Significance of Autoimmune Manifestations After Viral Vaccines*, 23 VACCINE 3876 (2002).

[14] Seigo Korematsu et al., *A Relapse of Systemic Type Juvenile Idiopathic Arthritis After a Rubella Vaccination in a Patient During a Long-Term Remission Period*, 27 VACCINE 5041 (2009).

Pet'r's Ex. 38). The patient had systemic JIA and was in remission for four years. Pet'r's Ex. 38 at 1. Five days after a live-attenuated rubella vaccination, the patient had a second relapse of her disease with congestive heart failure. *Id.* There was no identified trigger for her first relapse, which had occurred four years prior and lasted less than two months. *Id.* The post-vaccination relapse was prolonged and different from her previous JIA active stages. *Id.* The authors wrote that this relapse "was suggested not to be directly related with rubella infection, but instead to be related with the molecular mimicry between rubella and JIA." *Id.* Dr. Gershwin acknowledged that systemic JIA, as shown in Korematsu et al., is different from polyarticular JIA, at issue here. Tr. 86. He also acknowledged a difference in the process of development of JIA as a relapse versus an initial manifestation following vaccination. Tr. 96–97. He testified, in a relapse situation, there could be multiple mechanisms involved and that you do not necessarily need molecular mimicry. Tr. 97.

Dr. Gershwin opined that viral infections, including rubella and mumps, have been linked to JIA via molecular mimicry. Tr. 65. Ellis et al. discussed environmental factors in JIA and noted studies that support the role of infection in increasing risk of JIA. Tr. 66 (citing Pet'r's Ex. 46). However, Ellis et al. wrote that "the mechanisms through which infection affects the risk of disease in JIA and in other autoimmune diseases remains speculative, and may be distinct between the different infectious agents." Pet'r's Ex. 46 at 8. "The protective role of early-life infections has been little examined in relation to JIA." *Id.* Nonetheless, Dr. Gershwin opined that vaccines mimic infections. Tr. 68.

At the hearing, I asked Dr. Gershwin if there is an additional mechanism for autoimmune diseases that are chronic. Tr. 93. He explained that after breach of tolerance, there may be bystander activation or epitope spread in the perpetuation of the disease. Tr. 93–94. When I asked him to explain, in terms of a timeline, how the convergence of these mechanisms work in this case, he stated:

> So I think there are multiple genetic elements involved in JIA. They include a genetic element, loss of tolerance. They also include a genetic element for loss of regulatory cells, which will perpetuate the immune response. They may also include a genetic element for immune activation. So I think what occurs is she gets the vaccination, it takes several days for the live virus to grow, have enough antigen to elicit an immune response. She has a molecular mimic between the vaccine and her joint. That begins the chronic immune disease. You get cells that become activated. As those cells get activated and get in joints, the other parts of the immune system say, hey, there's a fire going on, and other cells go in there. And we know that those other cells may not be antigen-specific. So we pull them out. Not all of them are antigen specific. That perpetuates the disease. It leads to inflammation because she doesn't have -- again, because of genetics, an adequate regulatory mechanism, then that perpetuates and leads to a further entry of other acute and then chronic inflammatory processes.

Tr. 94; *see also* Tr. 96 (testifying that bystander activation plays a role in JIA and any chronic immune disease).

Dr. Gershwin also relied on the Vaccine Injury Table to show that vaccination, specifically MMR vaccination, can produce a chronic arthritis. Tr. 65. He testified JIA is a form of chronic arthritis. *Id.*; *see also* Tr. 86 (stating JIA "is chronic and it is [a]n arthritis"); Pet'r's Ex. 39 (describing JIA as a chronic arthritis).

Dr. Gershwin testified that the adaptive immune response is "the production of autoreactive immune cells like T cells and antibody to protect ourselves," and takes "days to weeks" to occur. Tr. 69. And because JIA is an "antigen-driven lymphocyte-mediated autoimmune disease," Dr. Gershwin opined that the "latency time between [L.Y.'s] vaccination and the appearance of symptoms [five to six] weeks later would be consistent with molecular mimicry and an adaptive immune response against self." Pet'r's Ex. 33 at 4, 12 (discussing an immune response which peaks within six weeks). He also noted that "[c]hronic arthritis within seven to 42 days following MMR is a [T]able injury and it is well-known and accepted." *Id.* at 12.

Based on the photograph L.Y.'s mother took, Dr. Gershwin opined onset was May 20, 2016. Tr. 75 (citing Pet'r's Ex. 21); Tr. 89. He described what was happening in the picture: "an immune reaction that's reacting with some antigen within the synovium of [L.Y.'s] ankle." Tr. 76. Six weeks is "how long it takes for a mature antibody response or autoreactive T cells to respond." Tr. 74. "[S]ix weeks would be a very reasonable amount of time to expect a response." Tr. 75; *see also* Pet'r's Ex. 33 at 12.

According to Dr. Gershwin, the "only significant immunological event that occurred within six weeks of the onset of [L.Y.'s] JIA were the vaccinations." Pet'r's Ex. 33 at 7. He could not find any other explanation for L.Y.'s JIA other than the vaccines. *Id.* at 12; Tr. 79. While he testified that he could not distinguish which vaccine was involved, between varicella and MMR, he opined it was more likely MMR because "there's more literature on the MMR, but [he could not] exclude the possibility that it was not the varicella." Tr. 76–77.

As to the infections L.Y. had prior to vaccination, Dr. Gershwin opined that had they been within six weeks of the onset of her JIA, he "wouldn't be sitting here with the opinion [he's] giving [] now." Tr. 79. While Dr. Gershwin believed the date of onset was the photograph on May 21, 2016, he commented that "[i]f indeed there was evidence of an acute arthritis [before May 21, 2016] following a roseola within a period of six weeks, then certainly it ought to be discussed and -- and taken into account." Tr. 89; *see also* Pet'r's Ex. 47 at 6 ("I would agree that any infection within six weeks of the onset of her [JIA] would be an essential point of discussion of etiology. However, I would be unable to go beyond six weeks."). However, he noted the infections were earlier and had resolved within six weeks of onset. Tr. 79. Moreover, he noted there has not been discussion in the medical community of "the roseola virus inducing arthritis the way there has been with mumps and rubella." Tr. 90.

In response to Dr. Rose's opinions regarding antibiotics as a potential cause of JIA, Dr. Gershwin opined that Dr. Rose "mischaracterize[d] the role of microbiota in JIA pathogenesis." Pet's's Ex. 47 at 6; *see also* Tr. 64. Dr. Gershwin opined microbiota is something that makes you more predisposed to autoimmunity but is not necessarily an inducing agent. Tr. 64 (citing Pet'r's

Ex. 65 at 12 fig. 4);[15] Tr. 79–80 (testifying flora in the gut from antibiotics is "one element that will predispose you to become more susceptible to an autoimmune and inflammatory response. But there's no evidence that itself induces an autoimmune disease"). Wang et al. reviewed environmental influences on autoimmunity. Pet'r's Ex. 65 at 1, 10–13. They found vaccines to be a noninfectious agent to autoimmunity with the following mechanism: "[s]timulate the immune system via pattern recognition receptors, such as TLRs, increase the risk of initiation or progression of [autoimmune diseases]." *Id.* at 13 tbl. 4. While they did not list antibiotics or microbiota as an agent for autoimmunity, they found that microbiota is pivotal to homeostasis. *See id.* at 12 fig. 4, 13 tbl 4. "[B]y modulating innate and adaptive immunity, the microbiota and nutrition (e.g. vitamin D, iodine[,] and gluten) may also contribute to loss of tolerance." *Id.* at 12 fig. 4. Dr. Gershwin agreed with Dr. Rose that "the microbiome is becoming increasingly important in our understanding of a predisposition to autoimmunity," but that it is just a predisposition to autoimmunity, it does not cause autoimmunity. Tr. 191; *see also* Pet'r's Ex. 47 at 8 ("[Microbiota] does not itself cause autoimmunity, but, rather, it changes immune regulation."). If, however, L.Y.'s use of antibiotics did change her microbiota, Dr. Gershwin opined it would "lead to alterations in her immune regulation" and make her "more susceptible to vaccine-induced autoimmune disease." Pet'r's Ex. 47 at 8.

**2. Dr. Rose**

Dr. Rose agreed with Dr. Gershwin and L.Y.'s treating providers that the correct diagnosis is ANA positive polyarticular JIA, complicated by uveitis. Resp't's Ex. A at 11; Tr. 104–05, 164. He disagreed, however, that L.Y.'s JIA was caused by her vaccination, and instead was "due to chance." Resp't's Ex. A at 22. *But see* Tr. 47 (testifying that he found a potential alternative mechanism for the triggering of L.Y.'s JIA). He testified there is no evidence "in the clinical world or in the lab world for [molecular mimicry] to have happened here." Tr. 147.

First, Dr. Rose stressed "that the word 'idiopathic' (arising spontaneously or from an obscure or unknown cause: PRIMARY- Merriam-Webster dictionary) is contained within the very name of the disease in question." Resp't's Ex. C at 2 (opining JIA "is a disease of unknown etiology therefore I am not in a position to offer a definite etiology of the disease"). Thus, a potential trigger, if one exists, is unknown. *Id.* He opined, "[w]e do not know that any triggering event is necessary to unleash this rheumatic disorder which is heavily determined by genetic factors." Resp't's Ex. A at 16. When asked at the hearing if JIA is an antibody-mediated disease, Dr. Rose responded, "[n]ot that I know."[16] Tr. 111. "It's a disease where autoantibodies are generated, antinuclear antibodies or rheumatoid factor and the other subset, but we don't know they're mediated themselves by pathogenic autoantibodies." *Id.*

At the hearing, Dr. Rose acknowledged that JIA is an autoimmune disease, that molecular mimicry is a known mechanism of autoimmunity, and that molecular mimicry has been established as a mechanism for autoimmune disease. Tr. 165. But he did not think there was epidemiological

---

[15] Lifeng Wang et al., *Human Autoimmune Diseases: A Comprehensive Update*, 278 J. INTERNAL MED. 369 (2015). Dr. Gershwin is a named author on this review article.

[16] Dr. Rose later testified that studies have shown that JIA "is suggestive of an antigen driven in the joint. . . ." Tr. 119.

evidence to support molecular mimicry here. *See* Tr. 175–76. Dr. Rose began his own causation[17] opinion with the following disclaimer:

> In discussing benign childhood infections as potential pathogenetic factors in polyarticular JIA we should begin by asserting that childhood viral infections are common and that the likelihood for the onset of any chronic disease like JIA to coincide with an infectious event is very high, just by chance. The same can be said about vaccines as the CDC vaccination calendar among toddlers and young children is extremely busy. The possibility of spurious temporal associations between infection or vaccination and JIA onset are therefore always to be taken into account when discussing causality.

Resp't's Ex. A at 13. "Vaccines, like infections are very frequent in young children and as for infections[,] the temporal association between vaccination and onset of JIA could be simply random." *Id.* at 16. He offered that one way to distinguish between pathogenic and random association is to study the relationships "systemically using prospective cohort or case-control designs." *Id.*

Dr. Rose pointed out that during the six months leading up to the onset of L.Y.'s JIA, she had four documented infections including an ear infection requiring antibiotics and an episode of roseola at the end of March 2016, 13 days before her MMR vaccine and seven weeks before the onset of her JIA (May 20, 2026). Resp't's Ex. A at 13–14. This is significant to Dr. Rose based on the following medical literature.

Horton et al.,[18] in which Dr. Rose is a named author, performed a "nested case-control study in a healthy population cohort of 1,000,000 children from the UK (the THIN database) and looked at infection rates and antibiotic exposure among children who ended up developing JIA." Resp't's Ex. A at 14 (citing Resp't's Ex. A, Tab 4). "Antibiotics can alter some subjects' intestinal microbiota for [at least six] months," and the "human microbiome plays important roles in immune regulation and self-tolerance." Resp't's Ex. A, Tab 4 at 2, 6. Thus, Horton et al. sought to test the hypothesis that antibiotic exposure was associated with newly diagnosed JIA. *Id.* at 1. There were 152 cases of diagnosed JIA. *Id.* at 5. After adjusting for confounders, the authors found that receiving at least one "antibiotic prescription was associated with an increased risk of developing JIA." *Id.* "Antibiotics prescribed within [one] year of diagnosis (and within [six] months of first joint symptom or rheumatology referral) showed the strongest association with JIA." *Id.* at 6; *see also* Tr. 150 (testifying that Horton et al. tells us that you can induce dysbiosis by a single course of antibiotics within six months, and that infections themselves, even without antibiotics can induce dysbiosis). The authors found "that treatment with antibiotics was associated with the development of JIA in a large general pediatric population. Resp't's Ex. A, Tab 4 at 9. "These findings suggest a potential role for antibiotics in the pathogenesis of JIA, perhaps mediated through changes in the microbiome. If this association is causal, antibiotics could be considered a potentially modifiable risk factor for JIA." *Id.* Dr. Rose described intestinal dysbiosis as "a state of disequilibrium of the intestinal microbiome which leads to upregulation of T cells and a pro-

---

[17] Dr. Rose took issue with using the word "cause" and preferred "induce." Tr. 167.

[18] Daniel B. Horton et al., *Antibiotic Exposure and Juvenile Idiopathic Arthritis" A Case-Control Study*, 136 PEDIATRICS e333 (2015).

inflammatory milieu which in turn favors the development of JIA in a genetically predisposed child." Resp't's Ex. A at 15. Dr. Rose further testified that "dysbiosis produces some leakage form the intestine and T cells can get circulation and land -- land in the joint form just dysbiosis." Tr. 150–51; *see also* Tr. 176–77 (explaining dysbiosis).

However, Horton et al. had several limitations. Resp't's Ex. A, Tab 4 at 8–9. Horton et al. was unable to "differentiate the effects of antibiotic use from the effects of infection." *Id.* at 2. Thus, they could not "definitively rule out residual confounding from infections." *Id.* at 9. They also noted that "[a]ntibiotic-untreated infections can also precipitate changes in children's microbiota."[19] *Id.* at 8. Dr. Rose found this to be "less relevant in our case since L.Y. was exposed to both." Resp't's Ex. A at 14. Horton et al. was also unable to discern whether antibiotics were only associated with certain categories of JIA. Resp't's Ex. A, Tab 4 at 9. This included the inability to exclude subjects with systemic JIA, who present with symptoms including fever and rash that might initially be confused with infection and treated with antibiotics. *Id.* at 8. "If this association were category-specific, then the true effect could be larger for certain forms of JIA and null for others." *Id.* The authors added that children with JIA may be at risk for more infections generally before diagnosis due to immune dysfunction. *Id.* They commented that further research is necessary to confirm, among other things, the underlying mechanisms.[20] *Id.*

Similarly, Arvonen et al.[21] also found that "[p]revious early and repeated exposure to antibiotics may predispose individuals to develop JIA." Resp't's Ex. A, Tab 5 at 1. Arvonen et al. further explained the microbiome and how it can be impaired by agents such as antibiotics. *Id.* at 1–2, 3, 5. The authors concluded that the "use of antibiotics may reflect a shared susceptibility to infections and JIA, or antibiotics may trigger the development of the disease by intervening with mucosal commensal flora and homeostasis." *Id.* at 5. They found this particularly true for antibiotic use before the age of two, and the strongest associations they found were for penicillins and cephalosporins. *Id.* at 2. "Alternatively, the apparent association may reflect shared susceptibility to infections and JIA." *Id.* at 1. One limitation to this register-based study was "the lack of information of any genetic factors or other environmental risk factors that may contribute to the study results." *Id.* at 3.

Finally, De Filippo et al.[22] also described the effects of antibiotics in inducing dysbiosis. Resp't's Ex. A at 15 (citing Resp't's Ex. A, Tab 7). They explained how modification of microbiota causes dysbiosis that induces immunological imbalance. Resp't's Ex. A, Tab 7 at 1. In particular, "immune cells can reach extra-intestinal sites, such as joints and trigger local inflammation." *Id.* The authors discussed the Arvonen et al. study and described gut dysbiosis as "a potential pathogenic factor" for JIA. *Id.* Despite Dr. Rose's opinions on microbiota and autoimmunity, he

---

[19] Although Horton et al. commented that in their study, "untreated infections were not associated with JIA during any time period." Resp't's Ex. A, Tab 4 at 6.

[20] Dr. Rose stated the postulated mechanism is "antibiotic-induced alteration of intestinal microbiome leading to a state known as dysbiosis." Resp't's Ex. A at 15.

[21] Miika Arvonen et al., *Repeated Exposure to Antibiotics in Infancy: A Predisposing Factor for Juvenile Idiopathic Arthritis or a Sign of This Group's Greater Susceptibility to Infections?*, 42 J. RHEUMATOLOGY 521 (2015).

[22] Carlotta De Filippo et al., *Gut Microbiota in Children and Altered Profiles in Juvenile Idiopathic Arthritis*, 98 J. AUTOIMMUNITY 1 (2019).

did not dispute the concepts related to such in Dr. Gershwin's reference De Filippo et al. Resp't's Ex. C at 5–6.

At the hearing, Dr. Rose testified that

> recurrent benign infections directly, by being capable of reactivating those potentially autoreactive T cells that are there, or through their effect on the genes, i.e. epigenetics, eventually brings the child to a phenotype. And it is not possible, as we can see in the clinic, to specifically attribute to one single event, as in this case the attribution to the MMR vaccine. Because the MMR vaccine is just chosen to be the cause because we know it happened, but we know that other things happened before.

Tr. 148–49. He testified that the infections and antibiotics that L.Y. received in December 2015 "are more likely than the MMR if -- if we are to identify a trigger." Tr. 149. "And I am saying there is not -- I'm not denying the important of the trigger; I am saying that a knowable trigger, a trigger that you can pinpoint." *Id.*

Dr. Rose did not think molecular mimicry has been demonstrated here. Tr. 123. He generally described that you need cross-reactivity and loss of tolerance "for a mimicry phenomenon to take place." Tr. 118. Dr. Rose testified "that the not knowing what is the autoantigen in an autoimmune disease is not the rule [for molecular mimicry]. We don't know it in JIA, but in many of the autoimmune diseases we do know what these antibodies are directed against." Tr. 116. Dr. Rose maintained that molecular mimicry was "never involved" and accordingly could not explain any transition of mechanism from molecular mimicry to a chronic disease. Tr. 123–24.

Dr. Rose's critique of the theory's mechanism was based on the chronic nature of JIA. *See* Tr. 179–80. He testified "mimicry is not a likely mechanism in chronic arthritis given the way it presents with these T cells in the synovium creating havoc right away before much happens." Tr. 179. Dr. Rose clarified that he accepts the autoimmune nature of JIA, but not mimicry. Tr. 180. "But autoimmune mechanisms, autoreactive T cells to self neoantigens, antigens that get released by the joint destruction, this is what perpetuates the arthritis. That's adaptive." *Id.*

In his expert reports and testimony, Dr. Rose discussed the medical literature cited by Dr. Gershwin. *See e.g.*, Tr. 124–45. He was not aware of any reliable literature indicating the MMR vaccine can cause JIA. Tr. 124–25. Particularly, Dr. Rose pointed out that the only reference to post-MMR vaccine JIA is Korematsu et al.[23] *See* Resp't's Ex. A at 19. Dr. Rose opined that this case report "has no value" here because it involved systemic JIA, "a disease with a very different mechanism than polyarticular JIA, and involved a diseases flare, not initial onset. *Id.*; *see also* Tr. 143 (testifying this article is not "useful" or "proof of relationship between MMR and L.Y.'s case"); Tr. 108–10 (describing the difference between systemic and polyarticular JIA); Tr. 143 (stating that even Dr. Gershwin recognized the difference between the induction of a flare versus onset). He also did not believe molecular mimicry "has anything to do with systemic JIA." Tr.

[23] Dr. Rose testified that he did not believe the patient in Korematsu et al. had systemic JIA, but rather a genetic autoinflammatory disease. Tr. 142.

142. Dr. Rose also pointed out that Schattner discussed an association with the MMR vaccine and chronic arthritis, but not with JIA.[24] Resp't's Ex. A at 18. *But see* Tr. 125–27 (testifying that Schattner "actually talks against MMR and arthritis. I think that's the intention of the article."). Nonetheless, Dr. Rose testified that "molecular mimicry is not [even] a likely mechanism in chronic arthritis given the way it presents with these T cells in the synovium creating havoc right away before much happens." Tr. 179.

In his first expert report, Dr. Rose noted that while the first photograph of swelling in L.Y.'s ankle was May 21, 2016, the inflammation could have been present weeks before, but there are no photographs from April 2016 to confirm. Resp't's Ex. A at 10. Despite this uncertainty, he used May 20, 2016, as "a provisional date of onset of L.Y.['s] polyarticular JIA." *Id.* at 11, 22 (opining the "actual onset . . . has not been determined with the evidence provided"). At the hearing, Dr. Rose maintained that "we don't know when exactly the disease started." Tr. 149.

He agreed with Dr. Gershwin that "HLA associations suggest a role for adaptive immunity in polyarticular JIA and that this fact makes the time between vaccine and onset of arthritis coherent with what we expect from a physiologic immune response mediated by T cells and antibodies (adaptive immune response)." Resp't's Ex. A at 17–18. However, he opined this does not necessarily indicate that the mechanism of disease is linked to the biological function of the protein. *Id.* at 18. Assuming vaccination could cause JIA via molecular mimicry, Dr. Rose testified that six weeks would be appropriate timing. Tr. 168.

Dr. Rose again described the clinical presentation of L.Y. and her use of antibiotics and repeated infections, including the roseola infection she had seven weeks prior to "the theoretical disease onset." Tr. 149; Tr. 158–60; *see also* Resp't's Ex. A at 17. On December 9, 2015, L.Y. had an ear infection with fever and was prescribed cephalosporin. Tr. 158–59. On December 15, the antibiotics were stopped because L.Y. developed diarrhea. Tr. 159. According to Dr. Rose, "in itself, this is an indication of microbiome alteration at that time." *Id.* Then in February 2016, L.Y. developed another fever with a URI, although no antibiotics were used. *Id.* In March 2016, it was mentioned L.Y. had diarrheal disease that was also indicative to Dr. Rose "of something that could really affect the microbiome." *Id.* Finally, on March 30, 2016, L.Y. was diagnosed with roseola. *Id.* Dr. Rose testified that the roseola infection was "around six weeks plus" to disease onset and that the antibiotic-induced dysbiosis was within the timeframe explained in De Filippo et al., six months to two years. Tr. 160–61.

He testified that the vaccination was "sort of an arbitrary moment" because "we don't know when exactly the disease started," and "because other things happened really close and there were a lot more evident, clinically at least, than what the vaccine could have done." Tr. 149; *see also* Tr. 171 ("Nothing really happened to suggest that this trigger was a more significant trigger than the previous infection."). Moreover, Dr. Rose did not see any evidence in L.Y.'s clinical course that molecular mimicry was in place, such as a "rush." Tr. 169–70 ("Absent that biological evidence and absence that clinical evidence that the MMR did anything unusual in her, I think that the mimicry theory has not been demonstrated for this case."). For example, L.Y.'s roseola infection was "quite stormy in terms of an immune response" with fever and rash. Tr. 171. The

[24] Dr. Rose testified that "JIA is a chronic arthritis, but by no means all chronic arthritis are JIA or are they[] similar." Tr. 111.

"vaccine did not produce any of those clinical evidence that there was something unusual." *Id.* However, Dr. Rose admitted that L.Y. did not take any antibiotics or have diarrhea between the date of vaccination and the date of onset. Tr. 168. He testified that "the capacity of the vaccine to induce activation of autoreactive T cells to go to the joint is . . . likely less than a full-blown infection like Roseola that gave three days of high fever and then a rush." Tr. 151–52.

In sum, Dr. Rose's opinion is that "JIA is an idiopathic disease that may not need a trigger, yet if there is one[,] the infections [L.Y.] suffered and the antibiotic she received are more likely the triggers of her disease." Resp't's Ex. A at 22; *see also* Resp't's Ex. C at 5 ("I need to clarify once again that I have not set forth the exact reason for L.Y.'s diseases, which is well-regarded as idiopathic."); Tr. 173 ("I continue to believe that JIA is an idiopathic disease and we don't know what's going on."). Dr. Rose was asked several times if he believed L.Y.'s JIA was a random occurrence that did not necessitate a trigger, or if it was impossible to determine what her trigger was because specific JIA triggers have not been identified. *See* Tr. 174. He characterized the question as "philosophical." *Id.* He continued, "I don't think it's -- it was maybe random. Randomness is also a very loose definition, because what is randomness? But randomness means that we really don't know. Correct?" Tr. 175. He then asserted that in order to establish that molecular mimicry is a viable causation mechanism here, it must be proven with epidemiological studies generally and labs specifically. Tr. 176.

## V. Legal Standards

Petitioner's burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury. *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322, N.2 (Fed. Cir. 2010). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 837 (Fed. Cir. 1991). Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325 (Fed. Cir. 2006). Instead, Petitioners may satisfy their burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325–26.

To receive compensation through the Program, Petitioner must prove either (1) that he suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that he received, or (2) that he suffered an injury that was actually caused by a vaccination. *See* §§ 11(c)(1), 13(a)(1)(A); *Capizzano*, 440 F.3d at 1319–20. Petitioner must show that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)). Petitioners do not allege a Table injury in this case; thus, they must prove that L.Y,'s injury was caused-in-fact by a Table vaccine.

To prove an injury that was caused-in-fact by vaccination, Petitioners must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. § 300aa-13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321–22 (Fed. Cir. 2010) (quoting *Shyface*, 165 F.3d at 1352–53). Proof of medical

certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 837 (Fed. Cir. 1991). Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325 (Fed. Cir. 2006). Instead, Petitioners may satisfy their burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325–26.

In the seminal case of *Althen v. Sec'y of Health & Hum. Servs.*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. *See* 418 F.3d 1274, 1278–79 (Fed. Cir. 2005). The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *Id.* "[C]lose calls regarding causation are resolved in favor of injured claimants." *Id.* at 1280. Further, evidence used to satisfy one prong of the test may overlap to satisfy another prong. *Capizzano*, 440 F.3d at 1326.

Under the first prong of *Althen*, a petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *See Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. den'd*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548–49. Petitioners are not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge[] the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano*, 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278–81; *see also Moberly*, 592 F.3d at 1322. However, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Indeed, the Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019) (citing *Moberly*, 592 F.3d at 1322; *LaLonde*, 746 F.3d at 1339). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322. In general, "the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." *LaLonde*, 746 F.3d at 1339.

Under the second prong of *Althen*, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418

F.3d at 1279. The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the vaccination." 2004 WL 1717359, at *4 (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (citation omitted). Nevertheless, "[r]equiring epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibly raises a claimant's burden under the Vaccine Act and hinders the system created by Congress . . . ." *Capizzano*, 440 F.3d at 1325–26. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen* 418 F.3d at 1280.

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). Indeed, when reviewing the record, a special master must consider the opinions of treating physicians. *Capizzano*, 440 F.3d at 1326. This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras*, 993 F.2d at 1528. However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby*, 997 F.3d at 1383. While a special master must consider these opinions and records, they are not "binding on the special master or court." § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to finger causation-in-fact." *de Bazan v. Sec'y of health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

Although a temporal association alone is insufficient to establish causation, under the third prong of *Althen*, a petitioner must show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d at 1278. The special master cannot infer causation from temporal proximity alone. *See Thibaudeau v. Sec'y of health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Grant*, 956 F.2d at 1148 ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period . . . [w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983))).

A petitioner who satisfies all three prongs of the *Althen* test has established a prima facie showing of causation. *Hammitt v. Sec'y of health & Hum. Servs.*, 98 Fed. Cl. 719, 726 (2011). A petitioner who demonstrates by a preponderance of the evidence that she suffered an injury caused by vaccination is entitled to compensation unless the respondent can demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to the vaccination. *See Althen*, 418 F.3d at 1278; *Knudsen*, 35 F.3d at 547. In such a case, the government must not merely prove the existence of an alternative cause, but that such an alternative actually caused the injury. *Kundsen*, 35 F.3d at 549. Consequently, when and if the petitioner establishes a prima facie case, the burden the shifts to the government to prove that an alternative cause, unrelated to the administration of the vaccine, was the "sole substantial factor" in causing the alleged injury. *See de Bazan*, 539 F.3d at 1354; *see also Hammitt*, 98 Fed. Cl. at 726 (explaining that respondent's burden is to show that the "factor unrelated" was the "sole substantial factor" in causing the injury). Additionally, a factor unrelated "may not include 'any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition.'" § 300aa-13(a)(2); *see also Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349 (Fed. Cir. 2010) (stating that an idiopathic diagnosis cannot be a "factor unrelated," as it is idiopathic).

## VI. Analysis

### A. Diagnosis and Timing

The parties do not dispute diagnosis or L.Y.'s symptom onset. Tr. 5–6; Pet'r's Reply at 1; Resp't's Br. 14–15, 21. The parties agree that L.Y.'s diagnosis is JIA, specifically, nonsystemic or polyarticular JIA. Dr. Gershwin placed the date of onset to be both May 20 and May 21, 2016, but the difference of one day is immaterial here. Despite Dr. Rose's opinion that the precise date of onset cannot be confirmed, he used May 20, 2016, as "a provisional date of onset of L.Y.['s] polyarticular JIA." Resp't's Ex. A at 11. Moreover, at the start of the hearing, Respondent's counsel indicated he "adopted May 20[, 2016] as the [] date of onset." Tr. 6. This is approximately five and one-half weeks post vaccination.

Because JIA is an "antigen-driven lymphocyte-mediated autoimmune disease," Dr. Gershwin opined that the "latency time between [L.Y.'s] vaccination and the appearance of symptoms [five to six] weeks later would be consistent with molecular mimicry and an adaptive immune response against self." Pet'r's Ex. 33 at 4; *see also* Tr. 69 (testifying that an adaptive immune response and takes "days to weeks" to occur). Dr. Rose agreed with Dr. Gershwin that six weeks would be appropriate timing. *See* Resp't's Ex. A at 17–18 ("HLA associations suggest a role for adaptive immunity in polyarticular JIA and that this fact makes the time between vaccine and onset of arthritis coherent with what we expect from a physiologic immune response mediated by T cells and antibodies (adaptive immune response)."); Tr. 168 (Dr. Rose testifying that six

weeks would be appropriate timing, under the assumption that vaccination could cause JIA via molecular mimicry). Based on this, L.Y.'s onset of five and one-half weeks is consistent with the proposed mechanism.

L.Y.'s roseola infection was approximately seven and one-half weeks before onset. Any role that her infection could have played, either directly as an infectious trigger, or indirectly by way of antibiotics induced dysbiosis would be too remote based on the evidence to be the sole cause.

Accordingly, I find Petitioners have presented preponderant evidence of an appropriate temporal association between L.Y.'s MMR vaccination and onset of her JIA; therefore, Petitioners have satisfied the third *Althen* prong. The remaining dispute is the reliability of her theory as applied to this vaccine/injury (*Althen* prong one), and whether there is a logical sequence of cause and effect between said vaccine and injury (*Althen* prong two).

**B. Program Treatment of JIA**

Some special masters have found vaccines capable of causing *systemic* JIA, but the same is not true for *polyarticular* JIA (which involves multiple joints and does not feature pre-clinical symptom evidence of systemic inflammation). *See Pellegrino v. Sec'y of Health & Hum. Servs.*, No. 21-1608V, 2025 WL 2428901, at *16 (Fed. Cl. Spec. Mstr. July 25, 2025); *Putman v. Sec'y of Health & Hum. Servs.*, No. 19-1921V, 2022 WL 600417, at *19 (Fed. Cl. Spec. Mstr. Jan. 31, 2022) (discussing cases). Evidence that a child was not only diagnosed with *systemic* JIA, but had experienced fever and rash before rheumatologic symptoms were clinically evident, has been deemed supportive of a vaccine causal relationship. *See Jimenez v. Sec'y of Health & Hum. Servs.*, No. 17-1190V, 2021 WL 3179643, at *26 (Fed. Cl. Spec. Mstr. June 23, 2021) (hepatitis A and HPV vaccines found causal of systemic JIA). But in *Putman* (which notably involved the MMR vaccine), the Chief Special Master did not find the same reasoning persuasive when applied to the context of oligoarticular (non-systemic) JIA, "since the theory was vague, relying too much upon an elision between the impact of the innate and adaptive immune responses to meld into an autoimmune process, but without proof the vaccine could initiate it." *Pellegrino*, 2025 WL 2428901, at *16 (citing *Putman*, 2022 WL 600417, at *21–23). In another case, *Pellegrino*, the Chief Special Master again found Dr. Gershwin's theory too broad for oligoarticular JIA. *Id.* at *18. However, the main reason for denying entitlement in *Pellegrino* was because the Chief Special Master found preponderant evidence that onset occurred before vaccination. *Id.* at *17.

In *Cabrera*, however, the special master found the DTaP vaccine caused a non-systemic form of JIA. *Cabrera v. Sec'y of Health & Hum. Servs.*, No. 13-598V, 2017 WL 510466 (Fed. Cl. Spec. Mstr. Jan. 12, 2017). *Cabrera* involved a nine-month-old who had also tested positive for an HLA variant. *Id.* at *8–9. Based upon the expert input received (plus an acceptance of molecular mimicry as a pertinent mechanism when discussing toxoid-containing vaccines like DTaP), the special master determined that a reasonable causation theory had been offered to explain the disease onset in a three-week timeframe. *Id.* at *14–16.

In all, there is limited guidance in assessing whether a vaccine could cause a non-systemic form of JIA—the type at issue here. In addition to the few decisions, there is an available Table claim for "chronic arthritis" after receipt of rubella virus-containing vaccines (including MMR).

Importantly, the qualifications and aids to interpretation make clear that this type of joint injury is inconsistent with JIA. 42 C.F.R. § 100.3(c)(5)(C)(2). The parties' arguments for and against analogizing this case to a Table injury of chronic arthritis are incorporated below.

### C. *Althen* Prong One

Dr. Gershwin proposed molecular mimicry for how the MMR vaccine can cause JIA. He explained that inflammation provoked by infection or vaccination "activates antigen-presenting cells, leading to increased immunogenicity of auto-antigens, priming of T cells with broad specificities, polyclonal lymphocyte activation and subsequent autoimmunity." Pet'r's Ex. 33 at 3 (quoting Pet'r's Ex. 39 at 3); *see also* Tr. 51. He also indicated that once tolerance is lost, other mechanisms may be involved in the chronicity of the disease such as bystander activation, but that molecular mimicry is the likely initiator.

While Dr. Gershwin conceded that the exact etiology of JIA is unknown, literature consistently suggests an autoimmune, antibody-mediated condition. *See* Pet'r's Ex. 46 (indicating JIA is one of the least studied autoimmune diseases and research to identify environmental risk factors in JIA is lacking); Pet'r's Ex. 39 at 1 ("JIA is considered to be an autoimmune disease, which is a result of immune reaction caused or triggered by environmental factors such as infectious agents in a genetically susceptible host."); Pet'r's Ex. 63 at 2("We hypothesized that a proportion of T cells from the synovial fluid [] of patients with JIA were activated *in situ* by antigen-driven cell cycling."). Lin et al. explained that JIA is an autoimmune disease and that autoimmunity it a "result of immune reactions triggered by environmental factors in a genetically susceptible individual." Pet'r's Ex. 36 at 2. They found "increasing evidence of a distinct pathogenesis of []polyarticular JIA compared to systemic JIA." *Id.* at 1. "Oligo/polyarticular JIA is an antigen-driven lymphocyte-mediated autoimmune disease with abnormality in the adaptive immune system." *Id.* Lin et al. also found that "[i]mbalance between autoreactive Th1/Th17 and Treg cells leads to the failure of T cell tolerance to self-antigens, which contributes to the synovial inflammation of []polyarticular JIA." *Id.* As indicated by his testimony, Dr. Rose appears to agree with the literature on this point. *See* Tr. 119 (testifying studies have shown JIA is antigen driven); Tr. 165 (agreeing JIA is an autoimmune disease).

Dr. Gershwin further admitted there is no specific antigen identified and that it is still unknown whether there is specific peptide homology between the MMR vaccine and JIA. Petitioners need not make a specific type of evidentiary showing to prove that a theory is sound and reliable by preponderant evidence. Given the state of current scientific knowledge, there is no way that a petitioner could satisfy such a requirement. *See Knudsen*, 35 F.3d at 549 (explaining that "to require identification and proof of specific biological mechanisms would be inconsistent with the purpose and nature of the vaccine compensation program"). Program petitioners sometimes present homologies between vaccine components and human tissue, but such is not required to meet the preponderant standard for a theory of molecular mimicry. However, there must be some form of preponderant evidence that a cross reaction between the vaccine and body part at issue can occur. Indeed, "Petitioners cannot simply invoke the concept of molecular mimicry and call it a day. . . . Rather, they need to offer *reliable* and persuasive medical or scientific evidence of some kind . . . that suggests the vaccine components could interact with self structures as maintained." *Johnson v. Sec'y of Health & Hum. Servs.*, No. 14-254V, 2018 WL 2051760, at *26 (Fed. Cl. Spec. Mstr. Mar. 23, 2018). Here, given what is known about the disease, Dr.

Gershwin cited literature for and explained the proposed pathogenesis of JIA. He explained JIA is an immune-mediated condition with inflammation of the synovial joints and explained how the MMR vaccine induces a robust immune response that can lead to such inflammation.

While Dr. Rose acknowledged that JIA is an autoimmune disease, that molecular mimicry is a known mechanism of autoimmunity, and that molecular mimicry has been established as a mechanism for autoimmune disease, he opined molecular mimicry has "no role in polyarticular JIA, period." Tr. 178. He testified this is based on the absence of proof, specifically in the form of identified antibodies found in a patient's laboratory testing or epidemiological studies. While both of those types of evidence can and have been used in cases to articulate a theory, neither is required. When asked about the substance of the theory, Dr. Rose argued that the chronic nature of JIA is inconsistent with an acute vaccine trigger.

In response, Dr. Gershwin also attempted to compare vaccine-induced JIA to a Table chronic arthritis injury. While JIA is listed as ineligible for consideration as a Table arthritis injury, Dr. Gershwin compared JIA to chronic arthritis and testified that JIA is a form of chronic arthritis. *Tr. 65*; *see also* Tr. 86 (stating JIA "is chronic and it is [a]n arthritis"); Pet'r's Ex. 39 (describing JIA as a chronic arthritis). During his testimony, Dr. Rose agreed that JIA is a type of chronic arthritis (although not every chronic arthritis is JIA). This concession undercuts his main critique that it is not reasonable to apply a molecular mimicry mechanism to a chronic arthritis. Dr. Rose did not provide literature or opinion to explain what is different about the chronic nature of JIA vs generic chronic arthritis.

Respondent relies largely on the lack of epidemiological studies and other evidence approaching medical certainty to discount what Dr. Gershwin carefully described as a rare occurrence. The rarity of polyarticular JIA, notwithstanding the more common incidence of JIA helps to explain the lack of such studies. Additionally, because of the low incidence of serious vaccine-caused injury, we do not require epidemiological studies to meet the preponderant evidence standard. Indeed, the Vaccine Act only "require[s] a chain of reliable propositions supporting [a] petitioner's theory[]"). *D'Tiole v. Sec'y of Health & Hum. Servs.*, No. 15-085V, 2016 WL 7664475, at *24 (Fed. Cl. Spec. Mstr. Nov. 28, 2016). Dr. Gershwin has provided such evidence in the form of several pieces of medical literature that contemplate his hypothesis. Dr. Gershwin's theory, supported by articles, some of which he co-authored, were not persuasively rebutted by Dr. Rose; therefore, Petitioner has offered a scientific or medical theory that answers in the affirmative the question: can the vaccine at issue cause the type of injury alleged and met his burden pursuant to *Althen* prong one.

This is a close call; however, Petitioners have presented evidence that L.Y.'s condition is autoimmune, antibody-mediated, and multifactorial with risk factors that include genetic markers and robust immune activity. With what is known about JIA, the evidence Petitioners provided is enough to meet the preponderant standard for causation. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen*, 418 F.3d at 1280. Moreover, Dr. Gershwin's explanations of JIA, the immune system, and molecular mimicry in general were informative and helpful. Comparatively, Dr. Rose's opinions were, at times, difficult to follow and of limited probative value to counteract Dr. Gershwin's opinions. *See Broekelschen*, 618 F.3d at 1347 ("The special master's decision oftentimes is based on the credibility of the experts and the relative

persuasiveness of their competing theories”). I find Petitioners have provided preponderant evidence of a sound and reliable medical theory causally connecting the MMR vaccine to JIA; Petitioners have therefore satisfied *Althen* prong one.

**D. *Althen* Prong Two**

L.Y. was 15 months old when she received her first MMR vaccine on April 13, 2016. Prior to that, she had a roseola infection on March 30, 2016, a cold with fever on February 19, 2016, and an ear infection on December 9, 2015. The December ear infection prompted the use of antibiotics (cefdinir). One week after starting the antibiotics, L.Y.’s parents were advised to discontinue use of them due to diarrhea. L.Y.’s mother documented swelling in L.Y.’s ankle on May 21, 2016. Because she had not had a recent fall or injury, L.Y.’s mother decided to just watch it. L.Y. presented to the pediatrician on July 12, 2016, for swollen knee and ankle joints. A Lyme panel was negative. L.Y. returned to the pediatrician on July 20, 2016, and the assessment was “[a]cute arthritis, cause uncertain.” Pet’r’s Ex. 6 at 21. On July 22, 2016, L.Y. saw pediatric rheumatologist Dr. Cassidy. Dr. Cassidy’s assessment was polyarticular JIA. She wrote that L.Y. had “recent temps but likely attributable to viral infections. She had recent infection but, after the onset of [joint] symptoms making a post infectious/reactive arthritis less likely.” *Id.* at 87. In July 2017, pediatric rheumatologist Dr. Santiago confirmed the diagnosis of ANA positive polyarticular JIA. L.Y. was subsequently diagnosed with uveitis.

L.Y.’s mother asked the pediatrician if “exposure to normal vaccines ha[d] any relationship to [L.Y.’s] disease,” but none of the treating providers attributed her condition to vaccinations. *See* Pet’r’s Ex. 6 at 11. Dr. Williams from LifeSpan Testing & Integrative Longevity Medicine notated that L.Y.’s symptoms started after her MMR vaccine. *See* Pet’r’s Ex. 9 at 1.

Dr. Gershwin explained her clinical presentation at the immunological level. L.Y. got the vaccine “with the viruses. The viruses [] divide[d] until they reach[ed] a critical threshold of eliciting an immune response. But L.Y.’s immune system [was] unable to distinguish some antigens or epitopes on the surface of the viral vaccines from antigens in [her] own tissues.” Tr. 51. The immune response “produced autoreactive T cells, an antibody that reacted with her joints, but was actually intended to react with a virus.” *Id.* He stated this adaptive immune response can take days to weeks. He also noted that “[c]hronic arthritis within seven to 42 days following MMR is a [T]able injury and it is well-known and accepted.” Pet’r’s Ex. 33 at 12. Dr. Gershwin further pointed out that the “only significant immunological event that occurred within six weeks of the onset of [L.Y.’s] JIA were the vaccinations.” *Id.* at 7. While he recognized L.Y.’s prior infections, he stated they did not occur within six weeks of onset. Although he agreed “that any infection within six weeks of the onset of her [JIA] would be an essential point of discussion of etiology.” Pet’r’s Ex. 47 at 6. He could not, however, extend a causal relationship between infection and JIA onset beyond six weeks.

Dr. Rose said he would like to have seen an immune response to the vaccine, such as a fever or rash, for molecular mimicry to have occurred here, but that this was not demonstrated in the medical record. L.Y. was between 15 and 16 months old at the time of her MMR vaccination and onset of JIA symptoms. It is not uncommon for a young toddler to exhibit nonspecific signs, such as fussiness, before presenting with more specific symptoms. A mild fever may go unnoticed by caregivers if the child’s temperature is not checked. Similarly, a runny nose or irritability could

be attributed to normal physiological processes such as teething. Accordingly, I do not find the lack of an evident immune response in the medical record dispositive.

While Dr. Rose opined JIA is idiopathic and there is no definite etiology, he opined that if a potential trigger exists, here it was either L.Y.'s previous infections or the use of antibiotics. *See* Tr. 149. He cited multiple pieces of literature to support his position regarding "antibiotic-induced alteration of intestinal microbiome leading to a state known as dysbiosis." Resp't's Ex. A at 15. However, the medical literature cited did not identify antibiotics, microbiota, or dysbiosis as a trigger of autoimmunity. Rather, the literature identified it as a predisposition to autoimmunity. *See* Resp't's Ex. A, Tab 5 at 1 ("Previous early and repeated exposure to antibiotics may predispose individuals to develop JIA."); Resp't's Ex. A, Tab 7 (describing gut dysbiosis as "a potential pathogenic factor" for JIA); Pet'r's Ex. 65 at 12 ("[B]y modulating innate and adaptive immunity, the microbiota and nutrition (e.g. vitamin D, iodine[,] and gluten) may also contribute to loss of tolerance."). Dr. Gershwin opined consistent with this literature that microbiota is something that makes you more predisposed to autoimmunity but is not necessarily an inducing agent. Tr. 64. However, if L.Y.'s use of antibiotics did change her microbiota, Dr. Gershwin opined it would "lead to alterations in her immune regulation" and make her "more susceptible to vaccine-induced autoimmune disease." Pet'r's Ex. 47 at 8. Based on Dr. Gershwin's persuasive opinions consistent with literature, I do not find preponderant evidence that antibiotic-induced dysbiosis is an alternative cause of JIA here.

Indeed, this case is similar to *Shyface*, wherein there were multiple contributing factors. There, a baby was vaccinated with the whole-cell DPT vaccination at the time he was beginning to fight off an E. coli infection. *Shyface*, 165 F.3d at 1345. Both the DPT and the E. coli infection could and did cause fever, which rose to 110 degrees and resulted in the baby's death four days later. *Id.* Respondent defended the case and argued that the E. coli infection was the sole cause of the baby's fever and death. The testimony from the petitioner's treating physician showed that both the vaccine and the infection were equally responsible for the baby's fever and death. The Federal Circuit held that each of the two factors, the vaccine and the infection, were a substantial factor in causing the baby's high fever and death, and but-for the vaccination, the baby would not have had the high fever and would not have died. *See id.* The Federal Circuit ruled in favor of the petitioner though the petitioner did not prove that the DPT vaccine was the only or predominant cause of the baby's death. *Id.* at 1353.

Here, L.Y. was on antibiotics in December 2016, approximately five months prior to onset, had subsequent diarrhea, and at least two to three more documented infections prior to her MMR vaccination. Dr. Rose opined L.Y.'s diarrhea after her antibiotic use is evidence of dysbiosis. It is agreed that her subsequent infections induced immune responses. And Dr. Gershwin (and Dr. Rose) averred that there is a genetic predisposition to autoimmune diseases including JIA. Moreover, medical records indicate L.Y. has a family history of RA. *See* Pet'r's Ex. 9 at 1. In accordance with *Shyface*, I find it more likely than not that L.Y.'s genetic predisposition, family history of RA, previous infections and use of antibiotics, and the MMR vaccination played a role in the development of her JIA. While "the presence of multiple potential causative agents makes it difficult to attribute 'but for' causation to the vaccination," the several examples of predisposition (genetic, history of RA, and dysbiosis), coupled with a history of infections, lays a

foundation for vaccination to be a substantial factor in the development of JIA. *See Pafford*, 451 F.3d at 1358–59.

Petitioners have presented a logical sequence of cause and effect showing that L.Y.'s April 13, 2016 vaccination was a substantial factor in the development of her JIA. Therefore, Petitioners have satisfied the second *Althen* prong.

### E. Alternative Causation

Because I conclude that Petitioners have established a prima facie case, Petitioners are entitled to compensation unless Respondent can put forth preponderant evidence "that [L.Y.'s] injury was in fact caused by factors unrelated to the vaccine." *Whitecotton v. Sec'y of Health & Hum. Servs.*, 17 F.3d 374, 376 (Fed. Cir. 1994), *rev'd on other grounds sub nom.*, *Shalala v. Whitecotton*, 514 U.S. 268 (1995); *see also Walther v. Sec'y of Health & Hum. Servs.*, 485 F.3d 1146, 1151 (Fed. Cir. 2007). For the reasons stated above in *Althen* prong two, I find Respondent has not provided preponderant evidence of an alternate cause.

## VII. Conclusion

After a careful review of the record, and for the reasons discussed above, I find that Petitioners have established by preponderant evidence that L.Y.'s MMR vaccine administered on April 13, 2016, caused her to develop JIA. Therefore, Petitioners are entitled to compensation. A separate damages order will issue.

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master